*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

DEONTON AUTEZ ROGERS,

Defendant-Appellee.

FOR PUBLICATION
January 7, 2020

No. 346348
Wayne County Circuit Court
LC No. 18-006351-01-FH

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

Servitto, J. (*concurring in part, dissenting in part*).

I agree that the trial court erred as a matter of law in finding that the provisions of MCL 750.10 establish a substantive, strictly limited definition of "gender" to be used throughout the Penal Code. In all other respects, I dissent.

Although I disagree with the majority's conclusion that the word "gender" in MCL 750.147b does not include transgender persons,[1] I need not dive deeply into an analysis of past or current definitions of "gender" to conclude that defendant's conduct falls squarely within that unambiguously prohibited by MCL 750.147b. While I do not disagree that dictionaries may be used as an aid in interpreting statutory terms, "recourse to the dictionary is unnecessary when the legislative intent may be readily discerned from reading the statute itself." *ADVO-Sys, Inc v Dept of Treasury*, 186 Mich App 419, 424; 465 NW2d 349 (1990). Moreover, "[a] statute is not ambiguous merely because a term it contains is undefined." *Diallo v LaRochelle*, 310 Mich App 411, 417–18; 871 NW2d 724 (2015). Here, I do not believe that reference to a dictionary is necessary to discern the legislative intent in MCL 750.147b.[2]

---

[1] Transgender is an adjective, not a noun. See, e.g., Merriam-Webster's Collegiate Dictionary (11th ed.).

[2] I do, however, parenthetically note that the 1971 edition of The Random House Dictionary of the English Language, in defining "gender" states, "[t]he number of different genders in different

-1-

MCL 750.147b provides, in pertinent part:

(1) A person is guilty of ethnic intimidation if that person maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin, does any of the following:

The primary goal of statutory construction is to determine the intent of the Legislature by reasonably considering the purpose and goal of the statute. *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 51; 573 NW2d 611 (1998). While there is no binding authority stating the exact purpose of the ethnic intimidation statute, it can be gleaned from the language of the statute itself that it is intended to criminalize harassing and intimidating behavior when the behavior is based on a victim's specific characteristics. The Legislature sought to redress crimes motivated by a person's intolerance of another's characteristics specifically listed in MCL 750.147b (race, color, religion, gender, or national origin). In this matter, the victim was targeted specifically *because* she was assigned biologically male at birth. Our role is to effectuate the intent of the Legislature and I believe that to recognize that the victim here was targeted because of her gender, whether that which was expressed outwardly or that which defendant believed she should have outwardly expressed, has an important role in *effectuating the Legislature's intent*—to criminalize and punish hate-based or discriminatory intimidation and harassment.

I also do not believe that the majority's reliance on *Barbour v Dep't of Social Services*, 198 Mich App 183; 497 NW2d 296 (1993), to support its holding that "gender" was commonly understood as synonymous with "sex" at the time the statute was drafted, is correct. In that case, the plaintiff was subjected to harassment in efforts to get him to "engage in homosexual sex." *Id*. at 184. This Court thus stated that the "[p]laintiff's sexual orientation constituted the subject matter of the harassment." *Id*. Sexual orientation is not the same as gender,[3] and there is no indication that the intimidation and harassment of the victim in this case was based on her sexual orientation, as opposed to her gender. More importantly, while we are not bound by decisions made in other jurisdictions, I note that several United States Courts of Appeals have held that discrimination based on gender is "discrimination based on a failure to conform to stereotypical gender norms." See, e.g., *Smith v Salem*, 378 F3d 566, 573 (CA 6, 2004) (also noting that until recently, transgender people, such as people assigned male at birth "whose outward behavior and emotional identity did not conform to socially-prescribed expectations of masculinity" were denied protection by Title VII because discrimination on those grounds fell under *gender* rather than *sex* discrimination).

---

languages varies from two to more than twenty; often the classification correlates, *in part*, with sex or animateness" (emphasis added). In my opinion, when the Legislature does not designate a particular dictionary that it referenced in crafting a particular statute, it cannot be said that one dictionary is the best, let alone conclusive, determiner of legislative intent.

[3] "Sexual orientation" generally refers to one's preference in sexual partners. See, e.g., Random House Webster's Collegiate Dictionary (1995).

In similar vein, I do not believe that reliance upon the legislative history of MCL 750.147b in ascertaining the meaning and intent of the statute is appropriate. There are inherent problems in utilizing legislative history rather than relying upon a plain reading of the unambiguous text. As our Supreme Court has stated, "construing an unambiguous statute by relying on legislative history at the very most . . . allows the reader, with equal plausibility, to pose a conclusion of his own that differs from that of the majority." *People v Gardner*, 482 Mich 41, 57; 753 NW2d 78 (2008) (internal quotation marks and brackets omitted). Here, the legislative history cited by the majority refers to the House of Representatives adding the term "sexual orientation" to the list of prohibited motivations and the Senate thereafter adopting a substitute that eliminated the phrase "sexual orientation" and added the term "gender." While the majority views this as an "exchange" of terms, there is no indication that the Legislature intended that "gender" be a synonym of, and thus a *replacement for*, "sexual orientation." It is just as likely (more likely, in my opinion) that the Legislature viewed these as differing terms and simply determined that the inclusion of only the term "gender" better reflected the intent of the statute.

Even employing the majority's definition of "gender" as synonymous with "sex" and "the biological roles of male and female," a plain reading of the statute would dictate that, whenever a victim's sex (i.e., "biological role of male or female") was the impetus for the intimidating or harassing behavior, the conduct falls within the ethnic intimidation statute. If, for example, the victim was a man who was harassed or intimidated based upon his "biological role as male," the conduct would be criminal under the statute. The same would hold true for a woman who was harassed or intimidate due to her "biological role as female." I can see no plausible reason to determine that the ethnic intimidation statute applies to biologically assigned males who present an outward appearance of male and biologically assigned females who present an outward appearance as female but not to persons whose biologically assigned sex may be different from the sex that their outward appearances reflect. Defendant specifically intimidated and harassed the victim because of her biologically assigned sex. Harassment based on gender (i.e., biological sex) is equally at the root of all the scenarios and is the prompting for the harassing or intimidating behavior. The victim's biologically assigned sex (gender) was thus the impetus for defendant's conduct towards her. "Courts should not abandon common sense when construing a statute," *Hmeidan v State Farm Mut Auto Ins Co*, 326 Mich App 467, 478; 928 NW2d 258 (2018) (citation omitted), and common sense dictates that *whenever and in any circumstances* where the victim's sex prompts harassing or intimidating behavior, that conduct falls within that prohibited by MCL 750.147b.

In *People v Stevens*, 230 Mich App 502; 584 NW2d 369 (1998), this Court was called upon to determine whether there was sufficient evidence to sustain a conviction of ethnic intimidation under MCL 750.147b. There, an incident occurred at a fast food restaurant in which defendant threatened a woman and threw a punch at her after her child interrupted defendant while he was placing his order. *Id*. at 503-504. This Court found that:

> the fact that defendant started a heated argument over a trivial matter would probably not be sufficient to allow a jury to find defendant guilty of ethnic intimidation beyond a reasonable doubt. Here, however, defendant's words provided strong evidence of a racist motive. Defendant's use of the word "nigger," his reference to the complainant as a "black bitch," and his remark that "you

people shouldn't be allowed in here" explained his otherwise inexplicable actions. Taken in the light most favorable to the prosecution, this evidence was sufficient to allow the jury to conclude that defendant was guilty beyond a reasonable doubt. [*Id*. at 506]

While the issue before this Court is not one of evidence sufficiency, it is equally clear that defendant's language used during the incident provides strong evidence of a motive based on gender (or sex, again using the majority's chosen definition). Steuball informed defendant that she was a transgender person. Defendant asked Steuball about her sex organs and asked Steuball if he could see "it." He continued to make derogatory remarks, called her a man and asked to see her penis, after which he threatened to kill her. This conduct and words cannot be seen as motivated by and centered upon anything but the sex (gender) of the victim. Just as a person's religion may not be outwardly apparent, but may be sometimes gleaned from his or her words or chosen manner of dress, and thus motivate intimidation or harassment, so too can a person's gender. And it is the harassment or intimidation that follows the recognition of and apparent disagreement with another's religion or gender (among other things) that is criminalized under MCL 750.147b.

Finally, the role of the judiciary is, indeed, to interpret the law. "[T]he proper role of the judiciary is simply to apply the terms of the statute to the facts of the particular case." *Smitter v Thornapple Tp*, 494 Mich 121, 129; 833 NW2d 875 (2013). Here, applying the term "gender" in any sense, whether it is interpreted as equating with "sex" or has a broader meaning, defendant engaged in harassment and intimidation of Steuball based on her gender. It is only when one wanders beyond the specific language in the statute that the opposite result can be reached. Very simply put, would this incident have occurred had the victim not been biologically assigned male? Undoubtedly not. I would thus find that the district court did not abuse its discretion in binding defendant over on the ethnic intimidation charge, and further find the trial court erred in concluding otherwise and erred in granting defendant's motion to quash that charge.

/s/ Deborah A. Servitto